SMITH v. THE WABASH, ST. LOUIS & PACIFIC RAILWAY COMPANY, *Appellant*.

1. **Negligence**: RAILROAD : TRAIN DISPATCHER. A train dispatcher of a railroad, who has the control of the movement of its trains, and to whose orders the conductors and engineers are subject, is the representative of the company, and is not a fellow-servant with those engaged in operating and moving the trains.

2. —— : —— : ——. The company is liable for an accident occurring through the negligence of such train dispatcher, in ordering the movement of its engines, whereby a fireman on one of the latter is killed.

3. —— : —— : ——. Nor does it make any difference, as regards the liability of the company, that the engine was on the road when the collision occurred, under verbal orders of the train dispatcher, instead of written orders, as required by the company's rules.

4. —— : —— : ——. The train dispatcher having determined that, under existing circumstances, a written order could not be given, and, having given a verbal one, his act was that of the company, and binding on it.

5. **Practice** : HARMLESS ERROR. While the trial court committed error in permitting the jury to construe written rules of a railroad company, yet the judgment will not, on that account, be reversed, where such instruction did the company no harm.

6. —— : INSTRUCTION AS TO MITIGATING CIRCUMSTANCES. The jury were told that, in estimating the damages, they might take into consideration the mitigating and aggravating circumstances, without pointing out what circumstances were aggravating and miti-

gating; *held*, no error, the evidence disclosing no mitigating circumstances, but only the grossest negligence, on the part of the train dispatcher, through whom the injury occurred.

7. **Practice in Supreme Court:** REMITTITUR. The objection that a verdict is excessive may be obviated by a *remittitur* in the appellate court.

*Appeal from Livingston Circuit Court.*—HON. J. M. DAVIS, Judge.

AFFIRMED.

*W. H. Blodgett* and *G. B. Burnett* for appellant.

(1) The testimony showed that the fellow-servants of deceased were out upon the track, without written orders, in violation of the rules of the company, and were thereby guilty of negligence, which was the immediate cause of the injury complained of. *Thomas v. Railroad*, 51 Miss. 637; *Woolsey v. Railroad*, 33 Ohio St. 227; *Wright v. Railroad*, 25 N. Y. 562; *Wood v. Railroad*, 70 N. Y. 195. (2) The train dispatcher and deceased were fellow-servants. *Rose v. Railroad*, 58 N. Y. 217; *Chapman v. Railroad*, 55 N. Y. 579; *Slater v. Jewett*, 85 N. Y. 61; *Robertson v. Railroad*, 78 Ind. 77. (3) *Prima facie*, the train dispatcher, through whose negligence it is alleged in the petition the injury was occasioned, was a fellow-servant of deceased, and it was incumbent on the plaintiff to aver, and establish by proof, facts showing that such relation did not exist. *McGowan v. Railroad*, 61 Mo. 538; *Blessing v. Railroad*, 77 Mo. 410. The facts alleged in the petition to show that the train dispatcher and deceased were not fellow-servants were wholly unproved. (4) The material averment of the petition is, "that the train dispatcher gave an order, which, under the rules and regulations of the defendant, the men were bound to obey," while the uncontradicted proof was that the train dispatcher gave no order; that, under the rules and regulations,

orders could only be given in writing, and that it was the duty of the men to disobey all verbal orders. Therefore, as there was no proof of the material averments of the petition, the plaintiff was not entitled to recover, and defendant's demurrer to the evidence should have been sustained. *Harper v. Railroad*, 44 Mo. 488 ; *Buffington v. Railroad*, 64 Mo. 246 ; *Waldhier v. Railroad* ,71 Mo. 514 ; *Eden v. Railroad*, 72 Mo. 212 ; *Price v. Railroad*, 72 Mo. 414. (5) Assuming that the train dispatcher and deceased were not fellow-servants, the alleged order was not an order emanating from the defendant, nor one which the servants in charge of the engines were bound to obey. (6) The proximate cause of the injury was not the negligence of the train dispatcher, as alleged in the petition. The proximate cause of the injury was the negligence of the conductor of the engine, upon which deceased was employed, and of the yardmaster, in going for the caboose, without written orders, and in their failing to notify the train dispatcher that they were going. (7) The court gave improper instructions, at the instance of the plaintiff. *Burruss v. Blair*, 61 Mo. 133; *Edwards v. Smith*, 63 Mo. 119 ; *Rains v. Railroad*, 71 Mo. 164 ; *Regan, Adm'r, v. Railroad*, 51 Wis. 599 ; *Railroad v. Sweet, Adm'r*, 45 Ill. 197 ; *Railroad v. Sharman, Adm'r*, 43 Ill. 338 ; *Railroad v. Weldon*, 52 Ill. 290 : Pierce on Railroads, 397 ; *Nicholl v. Winfrey*, 79 Mo. 544. (8) The court refused to give proper instructions asked by defendant. See authorities *supra*.

*Waters & Wyne* for respondent.

(1) From the evidence it appears that the train dispatcher had the sole and exclusive control of all regular and extra trains and engines of defendant company, and of defendant's servants employed thereon. He exercised the power and discharged the duties of

train dispatcher and superintendent in regard to such trains and engines, and employes operating the same. *Blessing v. Railroad*, 77 Mo. 410 ; *Harper v. Railroad*, 47 Mo. 580 ; *Brickner v. Railroad*, 2 Lansing, 506 ; *Railroad v. McLallen*, 84 Ill. 109 ; *Washburn v. Railroad*, 3 Head. [Tenn.] 638 ; *Flike v. Railroad*, 53 N. Y. 553 ; *Boothe v. Railroad*, 73 N. Y. 41 ; *Railroad v. Henderson*, 37 Ohio St. 318 ; *Avilla v. Nash*, 117 Mass. 318 ; *Darrigan v. Railroad*, 24 Law Reg. [Conn.] 452 ; *Moore v. Railroad*, 85 Mo. 588. (2) If the train dispatcher knew, or by the use of ordinary care might have known, that engine 112 was out on the road after the caboose of 84, and sent the switch engine in charge of the yardmaster after the same caboose, whether by verbal or written orders, or permitted the switch engine to go, and plaintiff's husband, a fireman on 112, was thereby injured and killed, then the negligence of the train dispatcher is the negligence of defendant company. *Moore v. Railroad, supra ; Darrigan v. Railroad, supra ;* Shear. & Redf. on Neg., addenda, p. 25, sec. 100 ; Wood's M. & S., 'secs. 370, 450, 452; *Sheehan v. Railroad*, 91 N. Y. 332 ; *Railroad v. Stælke's Adm'r*, 8 Am. & Eng. Ry. Cases, 523 ; *Moon's Adm'r v. Railroad*, 49 Am. Rep. 404 ; *Railroad v. Swanson*, 16 Neb. 254 ; *Slater v. Jewett*, 84 N. Y. 61 ; Shear. & Redf. on Neg., p. 123, sec. 93, note 3. (3) The court below committed no error in the trial of the cause. Although the train dispatcher was present in court, he was not called to justify or excuse his conduct. The defence relied solely on the fact that, as the train dispatcher's orders were verbal, they were unauthorized and should have been disobeyed. The circumstances under which plaintiff's husband lost his life were of the most aggravating character, and the verdict was not excessive.

NORTON, C. J.—This is an action to recover damages for the killing of plaintiff's husband, alleged to have been occasioned by the negligence of defendant, in

which she recovered judgment for five thousand dollars, from which the plaintiff has appealed, and among others assigns as error the action of the court in refusing to instruct that, under the pleadings and evidence, plaintiff was not entitled to recover. A proper disposition of this question necessitates a review of the evidence, which shows that freight train No. 84 arrived from the west, on the morning of the fifteenth of December, 1881, at Stanberry, a station on the line of defendant's road, and the end of a division of said road, extending from Stanberry to Omaha; that, upon its arrival, it was discovered that the caboose belonging to it had become detached and was left standing on the track four or five miles west of Stanberry; that, at the time of the arrival of train 84, another freight train, No. 85, with engine No. 112 attached to it, was standing on the track already made up and ready to start going west. The conductor of this train, James E. McCarty, testified that his engine was No. 112; that Mike Bahn was his engineer and deceased his fireman; that his train was to go out; that he was standing by the train dispatcher's window, when train 84 came in, and Luke Ferriter, train dispatcher, said to him, "*Jim, you will have to take your engine and go after that caboose, I guess, as it will save time;*" that he asked Ferriter about orders, and Ferriter said he *couldn't give him orders as there was no operator at Conception;* that there was nothing coming east behind 84, and that he would be perfectly safe in going. Witness then said: "*I told him I would go down and see Mike; that if Mike would go, I would go after the caboose. I went down there* and saw Mike and we concluded to go after the caboose, and we started *off after it promptly, without going back to the dispatcher's office.*" That they found the caboose between three and four miles west of Stanberry, coupled on to it, and started back, and had gone, perhaps, a mile when they collided with the switch engine.

Mr. Bondurvant, who, at the time of the accident, was yardmaster at Stanberry, testified as follows: That train 85 was made up, and on the track ready to go west, when train 84 whistled for Stanberry; then, when 84 arrived, he discovered there was no caboose on the train; that, as the yard was blocked, he told the engineer of train 84 to go to the roundhouse, and that he would go after the caboose, the engineer having said he didn't think it was a great way back; that he went up to see the train dispatcher, Mr. Ferriter, and the latter asked him if number 85 had gone, and he answered "no," that they couldn't go until Burns arrived; he had charge of the train that came in without the caboose; he then said to him, "Ferriter, hadn't we better go and get the caboose, as it was lost up the road two or three miles?" that Ferriter asked him if 112 had gone, and he answered, "no"; that he did not ask him if they had gone after the caboose, and he understood him to have reference to 112, with train 85; that Ferriter then told him that he had better go and get the caboose, with the switch engine; he then asked Ferriter if he would need orders, and he said, "no," it was not necessary to have any, that he would protect him while he was gone, and would let nothing out till he got back; he then went down, got on the switch engine, and started, with three men on the engine besides himself; they met 112 about five miles west of Stanberry, backing up with the caboose; the two engines collided, and plaintiff's husband was killed; that he did not notice what engine was standing in the yard when he left.

It was argued that the rules and regulations for the movement of trains and engines, in force at the time of the accident, and printed on time-table 49, were known and understood by the conductor and engineer in charge of engine 112, by the yardmaster in charge of the switch engine, and by the train dispatcher. Plaintiff

also put in evidence the following rules, printed on said time-table 49 :

"Rule 62. The superintendent and appointed train dispatchers are the only persons authorized to move trains by telegraph.

"Rule 63. No wood, construction, or extra train, or engine, must be run upon the road, without written orders or instructions, from persons authorized to move trains.

"Rule 64. All telegraphic orders, for the movement of trains, will be addressed to conductors and engineers. The operator receiving such an order will read it aloud to the conductor and engineer, and receive their understanding in writing; will repeat it back to the dispatcher, precisely as sent. If correctly repeated, the dispatcher will return the signal, 'O. K.,' which must be acknowledged by the operator by a like signal, followed by his initial and office call. The operator will endorse the dispatcher's O. K. on the order, and deliver it to the conductor and engineer to whom it is addressed. In no case will an operator repeat an order until he has first obtained, in writing, the understanding and signature of both conductor and engineer.

"Rule 65. Should the line, from any cause, fail to work, before the party has received the O. K., he will not deliver such order."

Defendant, on its behalf, put in evidence the following rules, printed on time-table 49, and not offered by plaintiff :

"Rule 13. Always take the safe side in cases of the least uncertainty.

"Rule 14. Trains are to be run under the direction of the conductor, except when his directions conflict with rules, or involve any risk or hazard, in either of which cases all participators will be held alike accountable.

"Rule 66. The greatest care and watchfulness must

be exercised in sending and receiving orders in regard to running trains. Operators will not trust the delivering of train orders to other parties, but will deliver them in person.

"Rule 68. All orders and messages relating to the movement of trains must be written in full, and no abbreviation used except the telegraph signals, '9' (repeat back) and '13' (I understand that I am to ——)."

The defendant also introduced as witnesses, on its behalf, J. W. Blanchard, formerly superintendent of the Council Bluffs and Omaha division of defendant's road; W. I. Durbin, trainmaster, and, for many years, a train dispatcher for defendant; Mr. Beggs, a conductor, and Mr. McConnel, a locomotive engineer, both of whom were in defendant's employ at the time of and before the accident. The evidence of these witnesses tended to show that, under the rules, as they were understood and acted on by the employes on that division, an engine sent out on the line, beyond the switch limits of a station, after a caboose, would be an extra engine, and only authorized to go on a written order; that the running of irregular extra trains or engines was done only on written orders, issued by the train dispatcher; that time-table 49 was prepared by Thomas McKissock, general superintendent of defendant's road, and issued to the division superintendents, and distributed by them to the employes on their respective divisions; that the engines in question, in their movements after said caboose, were extra engines, and that, under the rules, it required that orders for the movement of said engines should be in writing; that the observance of said rule would tend to prevent collisions, and its non-observance would be likely to result in collisions; that it was the duty of the employes in charge of the engines in question to refuse to go out upon the road without orders, in writing, and that the train dispatcher had no authority to direct them to go, except by an order in writing, and

signing the name, or initials, of the division superintendent thereto; that, upon receiving the order in writing (if one had been given in this case), it would have been the duty of the person in charge of engine 112 to have gone to the registry book, at Stanberry, and registered his engine out, and, when he returned, to register it in ; that the train dispatcher issues his orders in three copies, on manifold paper, one of which is delivered to the conductor, one to the engineer, and one he retains, and the order is recorded in a book ; that, had the train dispatcher given a written order to the engineer and conductor of engine 112, when the yardmaster asked for orders to go with the switch engine, the train dispatcher would not have given him an order until the order to the engineer and conductor of engine 112 had been cancelled ; but that, had he made a mistake and done so, the yardmaster, when he came to register out the switch engine, would have discovered that engine 112 was out on the road, and could not have gone until that engine was registered in; that the accident in question resulted from the non-observance of the rules, and that, had the rules, as they were understood and acted upon by all the employes on that division, been observed, the accident could not have occurred.

On cross-examination, Mr. Blanchard, division superintendent, testified that Ferriter, the train dispatcher, had power, under the rules, to control the movement of trains and engines, and that, while he (Blanchard) had the same authority to move trains that the dispatcher had, he never assumed that authority, but loaded it on to the train dispatcher, and that the latter exercised the entire authority; that the engineer of engine 113, attached to freight train 84, could, and should, have gone back, without any orders, for the caboose, if it could have gotten out of the yards, even if the caboose had been left as far back as twenty miles. On cross-examination, Mr. Durbin testified that when

the yardmaster found that the caboose had been left back on the road, and that engine 113 could not get out to go after it, it was his duty to inform the train dispatcher of the fact, and to ask for orders to go after it with the switch engine, and that it was the duty of the train dispatcher to give the orders; that the train dispatcher should have kept the switch engine from going, if he knew the first engine had gone, and Blanchard testified that the train dispatcher, without much effort, could have ascertained whether the engine had gone. The trainmaster further testified, among other things, that the first fault was the train dispatcher's, in giving a verbal order, and the other fault was of the engineer, in obeying it.

It is insisted, by counsel, that the facts in evidence, which are, substantially, as above set forth, show that the death of plaintiff's husband was occasioned by the negligence of his fellow-servants, and that, therefore, the court erred in overruling the demurrer to the evidence. If the train dispatcher, yardmaster, engineer and fireman of engine 112, were fellow-servants, then error was committed by the court, in the above respect; but if the train dispatcher was not a fellow-servant, but the representative of the company, in regard to the movement of trains on the division referred to in the evidence, and his negligence was the proximate cause of the injury, the demurrer was properly overruled. It clearly appears, from the evidence, that the train dispatcher, at Stanberry, had the sole and exclusive control in directing the movement of trains on the division of defendant's road extending from Stanberry to Omaha, and that the conductors and engineers were subject to them when issued.

The authorities bearing upon the question as to whether or not a train dispatcher, invested with such control, is a fellow-servant with the conductor and engineer, and others engaged in actually operating and

moving trains, are conflicting and irreconcilable. The rule laid down in Massachusetts, and cases cited from other states, where it is held that all who are engaged in a common employment, working to accomplish a common result, without regard to rank, are to be regarded as fellow-servants, supports defendant's contention. While this court has held that, where one servant is injured by the negligence of a fellow-servant, no action therefor can be maintained against the master, only in exceptional cases (such as, when the servant employed was incompetent, which was either known, or might, with ordinary care, have been known, by the master), we have never gone so far as to adopt a rule by which to determine who are fellow-servants, so broad as that adopted in Massachusetts, nor are we disposed to do so now.

The tendency of recent decisions is to narrow, and not to broaden, the rule, notably so in the case of *Railroad v. Ross*, 112 U. S. 390, where it is said, "There is a clear distinction to be made, in relation to their common principal, between the servants of a corporation exercising no supervision over others engaged with them in the same employment, and agents of a corporation clothed with the control and management of a distinct department, in which their duty is entirely that of direction and superintendence." In *Sheehan v. Railroad*, 91 N. Y. 332, and *Railroad v. McLallen*, 84 Ill. 109, the superintendent and assistant superintendent, acting as train dispatchers, were held to be vice principals. In the case last cited it is said, that, as between the conductor and the company, the assistant superintendent, to whose orders the trains are all subject, is the representative of the corporation, and that the rule applies as well to all orders issued by his assistants and in his name.

That a train dispatcher is to be regarded as the representative of the company is, in effect, held in the fol-

VOL. 92—24

lowing cases: *Booth v. Railroad,* 73 N. Y. 38; *Railroad
v. Henderson,* 37 Ohio St. 552; *Washburn v. Railroad,*
3 Head. [Tenn.] 638; *Darrigen v. Railroad,* 24 Am.
Law Reg. 453. In the case last cited it is said: "It is
immaterial that these men are hired and paid by a com-
mon employer, and that their employment is designed to
accomplish one common result. That argument, if
pressed to its logical conclusion, would obliterate all
distinctions among those engaged in railroad business,
from the president down to the humblest servant, and
would practically exempt the company from all duty,
and all liability, to those in its service." It is previously
said, that "cases are constantly arising, especially in
the operation of railroads, which no general rule can
provide for, in which the master must be regarded as
constructively present, in which some one must be in-
vested with a discretion and a right to speak and com-
mand in his name and by his authority. Such a right
carries with it the corresponding duty of obedience,
some one must hear and obey. * * * It (the rail-
road company) must also devise some suitable and safe
method by which to run special and irregular trains and
regular trains when off their regular time. * * * Emer-
gencies will arise which no system of rules can anticipate
and provide for, in which the company must act promptly
and efficiently." In this case, the scheme devised was
to have these trains controlled by one who knew the
position and movement of every train on the road liable
to be affected by them, a train dispatcher, acting in the
name and by the authority of the superintendent. Is
there not a wide difference between the duty of such an
agent, and the duty of a locomotive engineer? The duty
of the former pertains to management and direction;
that of the latter to obedience.

What is here said applies to the facts of the case
before us, which shows that when freight train 84 ar-
rived at Stanberry from the west, freight train 85 stood on

the track ready to go out west, the direction from which 84 had just come, but could not go out because 84 had left its caboose back some four or five miles on the track, between Stanberry and Conception, a station on the road. The evidence is undisputed that the engineer of the engine which pulled 84 into the yard had the right, and it was his duty, to take his engine, and without orders, either verbal or written, to go back, if for the distance of twenty miles, and bring in the caboose; but owing to the crowded condition of the yard, he could not get his engine out, and he was ordered by the yardmaster to take it to the roundhouse. In this condition of things, the train dispatcher directed McCarty, conductor, to take engine number 112, which was hitched to freight train 85, and bring in the caboose, saying "he could not give him written orders because there was no operator at Conception, but that he would be perfectly safe in going, as there was no train coming east," whereupon, he was informed by McCarty that he would see his engineer and if he consented they would go. He did go, and from the very fact of his not returning to the train dispatcher, that officer could have drawn no other inference than that he had gone, and this inference could have been reduced to a certainty had he looked to ascertain the fact as to whether or not he had gone, but instead of this, with full knowledge of the fact that McCarty left telling him that he would go if his engineer would, with an assurance from his dispatcher that it would be perfectly safe for him to go, he directed the yardmaster to take his switch engine and bring in the caboose, promising to protect him while he was gone, without informing him that he had previously directed McCarty to go with engine 112, and without taking any steps to ascertain whether he had gone, which fact he could have ascertained by taking a few steps and simply looking, and it was this negligence that cost the fireman on engine 112 his life.

But it is earnestly insisted that, inasmuch as rule 26 forbade an extra engine from going out without written orders, McCarty was negligent in refusing to go without them. If the train dispatcher was the representative of the company in ordering the movement of trains, as we hold he was, then, under the emergency and condition of things existing when he determined that he could not give written orders, it was the determination of the company, and when he gave the orders verbally, as he did to meet the emergency, it was the company speaking. If the engineer, who pulled train 84 into Stanberry, had informed the train dispatcher that his caboose had been left behind, and that he could not get out of the yard with his engine to go after it, and had procured the use of engine 112, attached to train 85, for the purpose of going, and had gone after it, and had the train dispatcher afterwards instructed the yardmaster to take his engine and go, and the accident occurred as it did, could there be any question as to the liability of the company? We think not.

Upon the point under discussion, the case of *Moore v. Railroad*, 85 Mo. 588, has a direct bearing. In that case it appeared that the company had established a rule requiring all car repairers, when engaged in repairing cars, to set out red flags on each side of the place where they were at work as signals of warning to approaching trains. Notwithstanding this rule, the foreman of car repairs directed the plaintiff, without any flags being set out, as required by said rule, to repair the drawhead of a car, promising to protect him while so engaged, and an engine ran against the car severely injuring him, the company was held liable on the ground that the foreman was the *alter ego* of the company, and his promise of protection was binding, although the rule provided to secure the safety of the men had not been observed, but dispensed with.

It is next objected that the court erred in the second

and third instructions given for plaintiff, in that the jury were told, that if they found from the evidence that Ferriter was train dispatcher, and under the rules and regulations of defendant, he had control of the movement of trains and extra engines, and if, under said rules and regulations, he had control of the two engines in question, so far as running them on the road was concerned, and if, under said rules and regulations, and by reason of them, * * * said employes were subject to the orders and instructions of said train dispatcher, in relation to the running of said engines, then said train dispatcher was not a fellow-servant of the engineer. The specific objection made to these instructions is, that it was the duty of the court to construe the rules and regulations, read in evidence, and that it was error to leave the construction of them to the jury.

This position is well taken, and error was committed in the respect above noted, but the error was one in favor of defendant and against the plaintiff, inasmuch as the rules admitted of but one construction, as to the fact that the train dispatcher had control of the movement of trains and engines, and control of the engines in question, as to running them on the road, and subjecting the employes to his orders and instructions, and had the court construed the rules it could only have told the jury that under them, the train dispatcher had such control, and that the employes were subject to his orders.

It is, also, insisted that the court erred in the instruction given in relation to damages, in this, that the jury were told that they might take into consideration the mitigating and aggravating circumstances, without pointing out to them what circumstances were aggravating and what mitigating. While it is held in the case of *Rains v. Railroad*, 71 Mo. 169, that the court in its instruction should point out such circumstances, it is also said in the case of *Nagle v. Railroad*, 75 Mo. 653,

that where there are no mitigating circumstances the defendant cannot complain of such an instruction because of its generality. In this case, we do not perceive a single mitigating circumstance, but, on the contrary, the grossest negligence of the train dispatcher in sending out the second engine under the circumstances disclosed by the evidence.

It is, also, insisted that, under the facts found, plaintiff was only entitled to nominal damages. The evidence is that the deceased was the head of a family, thirty-nine years of age, able to perform the duties of fireman, and was so engaged when killed, and was always at work. These facts formed a basis on which the jury were authorized to find more than nominal damages.

As to the claim made that the verdict for five thousand dollars was excessive, it may be said that it is sufficiently answered by the action of plaintiff in entering a *remittitur* in this court for the sum of fifteen hundred dollars.

It is alleged in the petition that "the train dispatcher gave an order which, under the rules and regulations of the company, the men were bound to obey," and it is contended that this allegation was not proved, inasmuch as the order given was a verbal and not a written order. The company, through its train dispatcher, determined that, under the existing circumstances, a written order could not be given, and, having thus determined, gave a verbal order, which, emanating from the company through its representative, the train dispatcher, was obligatory.

Inasmuch as the entry of a *remittitur* in this court by plaintiff of the sum of fifteen hundred dollars, is to that extent an admission that the point made by defendant, that the judgment for five thousand dollars is excessive, is well taken, on the authority of the case of *Miller v. Hardin*, 64 Mo. 545, the judgment of the circuit court is in all respects affirmed, except as to said

sum of fifteen hundred dollars, which is remitted and to be deducted from the said sum of five thousand dollars ; and plaintiff and appellee is required to pay all costs of this appeal, which are adjudged by this court against her. All concur, except Sherwood, J., who dissents.